IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OLAF VENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-795 |
| | ) | |
| JOHN E. POTTER, | ) | Judge Joy Flowers Conti |
| Postmaster General of the United States, | ) | |
| and the UNITED STATES POSTAL | ) | |
| SERVICE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

**I.    *Introduction***

This case concerns discrimination and retaliation claims brought by plaintiff Olaf Venter ("plaintiff" or "Venter"), a former employee of the United States Postal Service ("USPS"), who alleges that he was terminated because of his age and disability, and in retaliation for statutorily-protected activities.   Pending before the court is a motion for summary judgment filed by the Postmaster General of the United States ("Postmaster General") and the USPS (collectively referred to as "defendants"), as well as a motion filed by defendants to strike an affidavit submitted by plaintiff in opposition to the motion for summary judgment.   For the reasons that follow, the motion for summary judgment will be granted in its entirety, and the motion to strike will be denied on the ground that it is moot.

**II.    *Background***

Venter was born on January 16, 1943.   (Joint Statement of Material Facts (Docket No.

45) ¶ 2.)   After three years of military service, Venter spent a year working for Bell Telephone Company.   (*Id.*)   He worked as a self-employed tractor trailer driver from 1971 through 1995. (*Id.*)   In October 1995, he started to work as a driver for a mail contractor.   (*Id.*)   Venter was hired as a full-time USPS employee in 1997.   (*Id.* ¶ 3.)

Between 2000 and 2007, Venter suffered from tendonitis, carpal tunnel syndrome, a shoulder and bicep tear, a bulging disc injury, and a depressive disorder.   (*Id.* ¶¶ 4-5.)   Because of his injuries, Venter was placed on limited duty.   (*Id.* ¶ 5.)   He sometimes disagreed with the precise manner in which the USPS opted to accommodate his impairments.   (*Id.* ¶¶ 6-11.)

In February 2004, Venter filed an administrative Equal Employment Opportunity ("EEO") complaint in connection with his work assignments, contending that Nathan Askew ("Askew") and Fred Reynolds ("Reynolds"), both of whom were supervisors, discriminated against him because of his age and disability.   (*Id.* ¶ 35.)   An administrative judge, without conducting a hearing, issued a decision finding that no discrimination had occurred.   (*Id.*) Venter initiated a second EEO complaint in August 2004, alleging that Leonard Baranowski ("Baranowski"), the manager of vehicle services, had denied two of his requests for advanced sick leave in retaliation for the filing of his earlier EEO complaint.   (*Id.* ¶ 36.)   A different administrative judge, without conducting a hearing, issued a decision finding that no retaliation had occurred.   (*Id.*)   Venter filed a third EEO complaint in April 2005, claiming that Baranowski had introduced errors into his pay and leave records in retaliation for his previous filings.   (*Id.* ¶ 37.)   He withdrew his request for a hearing in March 2006, and the agency rendered a decision finding that no retaliation had occurred.   (*Id.*)

On January 18, 2007, Baranowski offered Venter a new limited duty assignment requiring

2

him to work from 3:00 p.m. through 11:00 p.m. as a clerk in the transportation office two days per week, and to work from 6:00 p.m. through 2:30 a.m. in the mail processing unit during the remaining days of the week.   (*Id.* ¶ 6.)   Venter signed a form dated January 22, 2007, indicating that he was accepting the assignment "under protest."   (*Id.* ¶ 8.)   Unhappy with his new assignment, Venter asked Greg Hoburg ("Hoburg"), his union steward, to initiate the grievance procedure.   (*Id.* ¶ 9.)   Although Hoburg indicated that the filing of a grievance was not warranted, Venter persisted in his efforts to have one filed.   (*Id.* ¶ 10.)   In February 2007, Venter filed his fourth EEO complaint, alleging discrimination based on his age, disability and national origin, as well as retaliation for his earlier EEO filings.   (*Id.* ¶ 38.)

Venter approached Hoburg about filing a grievance on March 7, 2007.   (*Id.* ¶ 11.) Hoburg informed Venter that he did not wish to discuss the matter further, but Venter continued to insist that a grievance be filed.   (*Id.*)   Hoburg sought the intervention of Transportation Operations Supervisor Thomas P. Dziubinski ("Dziubinski"), who took Venter to a smoking area and told him that his behavior was inappropriate.   (*Id.* ¶ 12.)   Hoburg left his work station after the conclusion of his shift.   (Defs.' App. of Exs. in Supp. of Summ. J. (Docket No. 28), Ex. E at 74; Ex. H.)

Venter's encounter with Hoburg left him distraught.   Shortly after the verbal confrontation, Venter went to the Occupational Health Office, where he was treated by USPS nurses Kimberly Sample ("Sample") and Beverly Streitman ("Streitman").   (Joint Statement of Material Facts ¶¶ 16, 19; Defs.' App. of Exs. in Supp. of Summ. J., Ex. A at 85.)   Venter stated that he wanted to "punch" or "kill" Hoburg.   (Joint Statement of Material Facts ¶¶ 16, 19.) Sample, who had never dealt with Venter before, contacted Motor Vehicle Service ("MVS")

Supervisor Ed Hosack ("Hosack") to report Venter's statements about Hoburg. (*Id.* ¶¶ 18, 20.)

She also contacted Distribution Operations Manager Ken Pawlowski ("Pawlowski") about the

matter. (*Id.* ¶ 20.) Because of Venter's mental state, Sample believed it appropriate for him to

leave the premises and go home. (*Id.* ¶ 19.) At Sample's direction, Venter went to Hosack's

office, where he again expressed a desire to "kill" Hoburg. (*Id.* ¶ 21.) Hosack permitted Venter

to go home. (*Id.*)

The USPS maintains a "zero tolerance" policy prohibiting employees from making "any

actual, implied or veiled threat, made seriously or in jest." (*Id.* ¶ 13.) Threats made by

employees are evaluated on a "Priority Risk Scale." (Defs.' App. of Exs. in Supp. of Summ. J.

(Docket No. 28), Ex. N.) Threats deemed to convey an "Extreme Risk" of violence are

categorized as priority 1 threats, while statements involving "No Risk" of violence are

categorized as priority 4 "threats." (*Id.*) Priority 2 threats are those indicating the presence of a

"High Risk" of violence, and priority 3 threats are those indicating the presence of a "Low or

Moderate Risk" of violence. (*Id.*)

On March 9, 2007, a threat assessment meeting concerning Venter's threats against

Hoburg was conducted. (*Id.*) The assessment team determined that Venter's statements

constituted priority 2 threats. (*Id.*; Joint Statement of Material Facts ¶ 23.) Postal police

officers visited Venter at his home. (Joint Statement of Material Facts ¶ 25.) Venter indicated

that he had no intention of harming Hoburg. (*Id.*) In a letter dated March 9, 2007, Baranowski

informed Venter that he was being placed on "off-duty (without pay) status effective March 7,

2007 at approximately 9:58 pm." (Defs.' App. of Exs. in Supp. of Summ. J., Ex. L.) The

stated reason for this action was a concern that Venter's return to the workplace could have been

"injurious" to Venter or to others.   (*Id.*)   On March 14, 2007, the Postal Inspection Service issued an investigative memorandum concerning Venter's statements about Hoburg.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. H.)

After reviewing the investigative memorandum, MVS management officials initiated disciplinary proceedings against Venter.   (Joint Statement of Material Facts ¶ 27.)   On March 28, 2007, a predisciplinary interview was conducted.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. R.)   During the interview, Venter admitted that he had expressed a desire to "kill" Hoburg. (*Id.*)   He indicated, however, that he never intended to actually harm Hoburg, and that he had made that clear to Hosack.   (*Id.*)   On April 3, 2007, Dziubinski completed a form recommending that Venter's employment with the USPS be terminated.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. S.)   Baranowski concurred in this recommendation.   (*Id.*)   Dziubinski issued a "Notice of Proposed Removal" to Venter on April 6, 2007.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. T.)   Transportation Manager William Kustarz ("Kustarz") met with Venter and his counsel on April 23, 2007, in order to discuss the matter.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. U.)   In a "Letter of Decision - Removal" dated May 8, 2007, Kustarz informed Venter that his employment with the USPS was being terminated as of the close of business on May 16, 2007.   (*Id.*)

Venter appealed his discharge to the Merit Systems Protection Board ("MSPB").   (Joint Statement of Material Facts at ¶ 31.)   A hearing in connection with this appeal was conducted on September 11, 2007.   (*Id.*)   On October 10, 2007, an administrative judge issued a decision affirming the USPS' decision removing Venter.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. V.)   In that decision, the administrative judge rejected Venter's affirmative defenses of age

discrimination, disability discrimination and retaliation.   (*Id.*)   Venter subsequently filed a

petition for review with the MSPB, seeking review of the administrative judge's decision.   (Joint

Statement of Material Facts at ¶ 32.)   On May 7, 2008, the MSPB denied the petition for review.

(Defs.' App. of Exs. in Supp. of Summ. J., Ex. W.)

On June 9, 2008, Venter commenced this action pursuant to 5 U.S.C. § 7703(b)(2),

alleging violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C.

§§ 621 *et seq.*, the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701 *et seq.*,

and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*   On July

27, 2009, defendants filed a motion for summary judgment.   (Docket No. 25.)   On September 3,

2009, Venter filed a brief in opposition and supporting appendix in opposition to the motion for

summary judgment.   (Docket Nos. 32 & 33.)   On October 5, 2009, defendants filed a motion to

strike an affidavit contained in Venter's appendix.   (Docket No. 36.)   The pending motion for

summary judgment and motion to strike are the subjects of this memorandum opinion.

## III.    *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if,

drawing all reasonable inferences in favor of the nonmoving party, "the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."   FED. R. CIV. P.

56(c).   A motion for summary judgment will not be defeated by the mere existence of some

disputed facts, but will be defeated only if there is a genuine issue of material fact.   *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   In determining whether a dispute is genuine,

the court's function is not to weigh the evidence or to determine the truth of the matter, but only

6

to determine whether the evidence of record is such that a reasonable trier of fact could return a

verdict for the nonmoving party.   *Id.* at 249.

IV.   *Discussion*

    A.    **The Legal Bases for Venter's Claims**

Venter brings discrimination and retaliation claims under the ADEA, the Rehabilitation

Act and the ADA.   (Compl. (Doc. No. 1) ¶¶ 39-44.)   The federal-sector provision of the ADEA,

which is codified at 29 U.S.C. § 633a(a), provides that "[a]ll personnel actions affecting

employees or applicants for employment who are at least 40 years of age . . . in the United States

Postal Service . . . shall be made free from any discrimination based on age."   29 U.S.C. §

633a(a).   In order to establish a violation of the ADEA, Venter must show that his age was a

"but-for" cause of his discharge.[1]   *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009).

In *Gomez-Perez v. Potter*, 128 S. Ct. 1931, 1935-43 (2008), the United States Supreme Court

held that § 633a(a) prohibits a covered federal employer from retaliating against an employee

who files an administrative complaint alleging age discrimination.   The ADEA establishes a

private right of action for individuals aggrieved under the federal-sector provision.   29 U.S.C. §

633a(c).

Title I of the ADA prohibits certain forms of discrimination against disabled individuals

in the employment setting.   42 U.S.C. §§ 12111-17.   Under title I, the term "employer" does not

include "the United States" or "a corporation wholly owned by the government of the United

---

[1]The ADEA is unique among federal antidiscrimination statutes in that it only prohibits age discrimination in one direction (i.e., discrimination which favors the young and disfavors the old).   It does not prohibit discrimination which disfavors younger individuals, even where such younger individuals   are within the class of persons entitled to ADEA protection (i.e., individuals "who are at least 40 years of age").   *General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 584-600 (2004).

States."  42 U.S.C. § 12111(5)(B)(i).   The USPS is "an independent establishment of the

executive branch of the Government of the United States."  39 U.S.C. § 201.   As such, it is not

directly subject to the ADA's prohibitions.   *Hendrickson v. Potter*, 327 F.3d 444, 447 (5th Cir.

2003).   Therefore, Venter cannot assert claims against defendants directly under the ADA.

Section 504 of the Rehabilitation Act, which is codified at 29 U.S.C. § 794, provides that

"[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by

reason of her or his disability, be excluded from the participation in, be denied the benefits of, or

be subjected to discrimination under any program or activity receiving Federal financial

assistance or under any program or activity conducted by any Executive agency or by the United

States Postal Service."[2]   29 U.S.C. § 794(a).   Title I of the ADA went into effect on July 26,

1992.  Pub. L. No. 101-336, § 108, 104 Stat. 327, 337 (1990).   Shortly thereafter, on October

29, 1992, Congress added 29 U.S.C. § 794(d) to the Rehabilitation Act.   Pub. L. No. 102-569, §

506, 106 Stat. 4344, 4428 (1992).   Section 794(d) provides:

**(d) Standards used in determining violation of section**

The standards used to determine whether this section has
been violated in a complaint alleging employment discrimination
under this section shall be the standards applied under title I of the
Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.)
and the provisions of sections 501 through 504, and 510, of the
Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to
12204 and 12210), as such sections relate to employment.

---

[2]In his complaint, Venter specifies 29 U.S.C. § 794 as the basis for his claims under the Rehabilitation Act.
(Compl. ¶ 42.)   Therefore, the court has no occasion to consider whether he could assert viable claims under 29
U.S.C. § 791.   *See Freed v. Consol. Rail Corp.*, 201 F.3d 188, 191-92 (3d Cir. 2000).

29 U.S.C. § 794(d).   In light of this statutory language, the provisions of the ADA, although not

directly implicated in this case, control the disposition of Venter's claims under the

Rehabilitation Act.   *See Shiring v. Runyon*, 90 F.3d 827, 831-32 (3d Cir. 1996).   Violations of §

794 are actionable under 29 U.S.C. § 794a(a)(2).[3]   *Spence v. Straw*, 54 F.3d 196, 199-200 (3d

Cir. 1995).

Venter was informed of his discharge on May 8, 2007.   (Defs.' App. of Exs. in Supp. of

Summ. J., Ex. U.)   At that time,[4] title I's antidiscrimination provision provided:

> SEC. 102. DISCRIMINATION.
>
> (a)   GENERAL   RULE.--No   covered   entity   shall   discriminate
> against   a   qualified   individual   with   a   disability   because   of   the
> disability   of   such   individual   in   regard   to   job   application
> procedures, the hiring, advancement, or discharge of employees,
> employee compensation, job training, and other terms, conditions,
> and privileges of employment.

---

[3] The Rehabilitation Act makes the "remedies, procedures and rights" set forth in Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. §§ 2000d *et seq.* available to those whose substantive rights under § 794 of the Rehabilitation Act are violated.   29 U.S.C. § 794a(a)(2).   Although Title VI does not expressly create a private right of action for aggrieved individuals, the Supreme Court has found an implied private right of action within Title VI, which has been acknowledged by Congress in subsequent statutory amendments.   *Barnes v. Gorman*, 536 U.S. 181, 185 (2002).   Since Congress has incorporated Title VI's remedial scheme into the Rehabilitation Act, plaintiffs alleging violations of § 794 have a private right of action under federal law.   *Fowler v. UPMC Shadyside*, 578 F.3d 203, 207 n.2 (3d Cir. 2009); *Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of Pittsburgh*, 382 F.3d 412, 425-26 (3d Cir. 2004); *Spence*, 54 F.3d at 199-200; *Chedwick v. UPMC*, 619 F. Supp. 2d 172, 181 n.4 (W.D. Pa. 2007).

[4] On September 25, 2008, President George W. Bush signed the ADA Amendments Act of 2008 into law.   Pub. L. No. 110-325, 122 Stat. 3553 (2008).   The ADA Amendments Act of 2008 took effect on January 1, 2009.   Pub. L. No. 110-325, § 8, 122 Stat. 3553, 3559 (2008).   This legislation broadened the category of individuals protected under the ADA and displaced the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999).   *See Ragusa v. Malverne Union Free Sch. Dist.*, 582 F. Supp. 2d 326, 341-42 nn. 4- 5 (E.D.N.Y. 2008).   Because the ADA Amendments Act contains no language indicating that it applies retroactively, courts have construed its provisions to be prospective.   *Becerril v. Pina County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009); *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009).   Accordingly, Venter's claims under the Rehabilitation Act must be considered pursuant to the standards applicable under the ADA as of the date of his discharge.

Pub. L. No. 101-336, § 102(a), 104 Stat. 327, 331-32 (1990) (previously codified at 42 U.S.C. §

12112(a)).[5]   The ADA also contains provisions prohibiting certain forms of retaliation,

interference, coercion and intimidation.   Those provisions provide:

### § 12203.   Prohibition against retaliation and coercion

#### (a) Retaliation

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this [Act] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [Act].

#### (b) Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this [Act].

42 U.S.C. § 12203(a)-(b).   The standards applicable under these prohibitions are also applicable

in cases arising under the Rehabilitation Act.   29 U.S.C. § 794(d).

### B.    The *McDonnell Douglas* Framework

---

[5]Title I's antidiscrimination provision currently provides:

#### § 12112.   Discrimination

#### (a) General rule

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

10

Since this is an employment discrimination case in which no direct evidence of discrimination is presented, the United States Supreme Court's analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides the framework for allocating the requisite burdens of proof and production for purposes of defendants' motion for summary judgment.[6]   In an employment discrimination case of this kind, the plaintiff must establish a prima facie case of illegal discrimination.   *Id.* at 802.   If a prima facie case of discrimination is established, the burden of production (but not persuasion) shifts to the defendant to articulate legitimate, nondiscriminatory reasons for treating the plaintiff in an adverse manner.   *Id.* at 802-03.   If the defendant articulates legitimate, nondiscriminatory reasons for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reasons given by the defendant for such treatment are merely a pretext for unlawful employment discrimination.   *Id.* at 804-05.   Evidence that an employer's stated reasons for an adverse employment action are unworthy of credence is one form of circumstantial evidence that a plaintiff can use to establish the existence of intentional discrimination.   *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

The plaintiff's burden of establishing a prima facie case of disparate treatment is not onerous. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).   In order to establish a prima facie case of discrimination, the plaintiff need only show that: (1) he or she was a member of a statutorily-protected class; (2) he or she was qualified for the position; (3) he or she was aggrieved by an adverse employment action; and (4) the adverse employment action

---

[6]The *McDonnell Douglas* framework does not apply in an employment discrimination case in which direct evidence of discrimination is presented.   *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).   "Direct evidence" of discrimination is evidence that is "*so revealing of discriminatory animus that it is not necessary to rely on any presumption*" from the plaintiff's prima facie case to shift the applicable burden of production to the defendant. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995).   The evidence presented by Venter does not meet this standard.

occurred under circumstances giving rise to an inference of illegal discrimination.   *Cobetto v. Wyeth Pharms.*, 619 F. Supp. 2d 142, 153 (W.D. Pa. 2007).   The specific elements of a prima facie case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis."   *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999).   The prima facie inquiry "remains flexible and must be tailored to fit the specific context in which it is applied."   *Sarullo v. USPS*, 352 F.3d 789, 797-98 (3d Cir. 2003).   A prima facie case "raises an inference of discrimination" sufficient to shift the burden of production to the defendant because the court presumes that certain actions, if left unexplained, were "more likely than not based on the consideration of impermissible factors."   *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).   Because the prima facie inquiry in any case is fact specific, "[t]he touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value*, not whether they fit into a mechanical formula." *Cobetto*, 619 F. Supp. 2d at 153 n.3 (citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312-13 (1996)).

If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, nondiscriminatory reasons.   *Burdine*, 450 U.S. at 254-55.   To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254.   The inquiry concerning whether the defendant met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage."   *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509

12

(1993).   The defendant satisfies its burden of production, and rebuts the plaintiff's prima facie

showing of discrimination, simply by introducing admissible evidence that, if "*taken as true*,

would *permit*" a finding that the challenged employment action was taken for legitimate,

nondiscriminatory reasons.   *Id.*

If the defendant meets its burden of production, the dispositive factual issue is framed

with "sufficient clarity" to provide the plaintiff with "a full and fair opportunity to demonstrate

pretext."   *Burdine*, 450 U.S. at 255-56.   In order to establish that the defendant is liable for

illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a

discriminatory animus was the *real reason* for the adverse employment action at issue.   *Fuentes*

*v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).   Liability cannot be established upon a jury's mere

*disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon

the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of

an impermissible discriminatory criterion.   *St. Mary's Honor Ctr.*, 509 U.S. at 519 ("It is not

enough, in other words, to *dis*believe [sic] the employer; the factfinder must *believe* the

plaintiff's explanation of intentional discrimination.").   Evidence that an employer's proffered

reasons for an adverse employment action are false, when coupled with a plaintiff's prima facie

case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to

conclude that illegal discrimination has occurred.   *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 147-48 (2000).

"To discredit the employer's proffered reason, however, the plaintiff cannot simply show

that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

13

prudent, or competent." *Fuentes*, 32 F.3d at 765. The plaintiff has the burden of persuasion to prove that the defendant's real reason for terminating the plaintiff was in fact discriminatory. *Id.* at 764. The United States Court of Appeals for the Third Circuit in *Fuentes* set forth a two-pronged analysis for considering how a plaintiff may show that the reason given by defendant was discriminatory.

> [A] plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. . . . [T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons, . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

*Id.* (internal citations omitted). This standard places a difficult burden on the plaintiff. *Id.* The two prongs of the *Fuentes* test are distinct. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-13 (3d Cir. 1997) (analyzing ADEA action under both prongs of *Fuentes* framework).

Evidence used to establish a prima facie case of discrimination may also be relied upon to demonstrate pretext, since nothing about the *McDonnell Douglas* framework requires a court to ration the evidence presented in a particular case among the prima facie and pretext stages of the plaintiff's case. *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008). Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination. *Reeves*, 530 U.S. at 147. Circumstantial evidence is not only sufficient to sustain a finding of liability

14

for intentional discrimination, "'but may also be more certain, satisfying and persuasive than direct evidence.'"   *Desert Palace*, 539 U.S. at 100 (quoting *Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 508 n.17 (1957)).   Depending on the circumstances of the particular case at issue, a plaintiff can sometimes prevail on the basis of circumstantial evidence without introducing "additional, independent evidence of discrimination."   *Reeves*, 530 U.S. at 149.   Whether summary judgment is warranted in a given case depends upon the strength of the plaintiff's prima facie case, the probative value of the evidence discrediting the defendant's proffered reasons for the challenged employment action, and the presence or absence of additional evidence that may properly be considered by a court in determining whether a judgment as a matter of law is appropriate.   *Id.* at 148-49.

Although the Supreme Court formulated the *McDonnell Douglas* framework in cases involving Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the United States Court of Appeals for the Third Circuit has consistently applied that framework in cases where direct evidence of discrimination is not presented and which arise under the ADEA, the ADA and the Rehabilitation Act.   *Smith v. City of Allentown*, 589 F.3d 684, 689-91 (3d Cir. 2009); *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007); *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300-01 (3d Cir. 2004); *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).   The *McDonnell Douglas* framework is also used to evaluate retaliation claims arising under federal antidiscrimination statutes.   *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006).   Therefore, it will be used to evaluate all Venter's claims.

### C.     The Substantive ADEA Claim

Venter was sixty-four years of age at the time of his discharge and, hence, within the class

of persons entitled to statutory protection under the ADEA.   *See* 29 U.S.C. § 631(b).   His

discharge constituted a "personnel action" within the meaning of the ADEA's federal-sector

provision.   *See* 29 U.S.C. § 633a(a).   In order to establish a prima facie case of age

discrimination, Venter must produce evidence adequate to create an inference that his

termination was motivated by his age, which constitutes an illegal discriminatory criterion under

federal law.   *O'Connor*, 517 U.S. at 312.   In the absence of unusual factual circumstances, this

requires a showing that Venter was replaced by an individual sufficiently younger than him to

permit an inference of age discrimination to be drawn, or a showing that a similarly situated,

sufficiently younger employee was not discharged.   *Monaco*, 359 F.3d at 300-01.

Venter points to no evidence from which an inference of age discrimination could be

drawn.[7]   Indeed, he appears to argue in his brief only that he was the victim of retaliation for his

statutorily-protected activities.[8]   (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Docket No. 33)

at 2.)   He does not argue that he was replaced by a younger individual or that a similarly situated

younger individual was retained.   In his deposition testimony, Venter was unable to identify a

basis for believing that he was the victim of age discrimination.   (Defs.' App. of Exs. in Supp. of

Summ. J., Ex. A at 95-104.)   He testified that Dziubinski stated that Donald Drake ("Drake"), an

---

[7]The legal conclusions contained in Venter's affidavits concerning the defendants' discriminatory intent do not
constitute competent evidence of discrimination.   *See Aronson v. Capital One Fin. Corp.*, 125 F. Supp. 2d 142,
143-44 (W.D. Pa. 2000) (striking plaintiff's affidavits that "contain, in large part, a recitation or clarification of the
allegations set forth in the Complaint, assertions of legal conclusions, and legal argument"); *Herman v. Clearfield
County*, 836 F. Supp. 1178, 1186 (W.D. Pa. 1993) ("striking an expert's affidavit that contained "merely bald
statements of a legal standard").

[8]Venter essentially abandoned his substantive discrimination claims under the ADEA and the Rehabilitation Act by
failing to respond to the arguments raised by defendants in support of their motion for summary judgment.   *See
Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) ("Plaintiff makes no response to this argument, and
thus has waived his opportunity to contest it.").   The court will briefly address those claims in order to illustrate why
the entry of summary judgment in favor of defendants is "appropriate" for purposes of Federal Rule of Civil
Procedure 56(e)(2).   *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 173-76 (3d Cir. 1990).

MVS clerk, was "too old" to continue working.   (*Id.* at 99-100.)   This testimony is not sufficient to give rise to an inference that Dziubinski engaged in age discrimination when he recommended that Venter be terminated.   *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").   Although Venter expressed a subjective belief that he was the oldest employee on limited duty during the relevant period of time, Acting Transportation and Networks Manager Kristina J. Terrano ("Terrano") refuted that belief by identifying two limited-duty employees who were older than Venter.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. HH ¶¶ 2-4.)   Because Venter cannot establish a prima facie case of age discrimination, summary judgment will be entered in favor of defendants with respect to Venter's age discrimination claim under the ADEA.[9]

### D.      The Rehabilitation Act Claim

Congress amended the ADA and the Rehabilitation Act in order to broaden the category of individuals entitled to statutory protection from disability discrimination.   Pub. L. No. 110-325, 122 Stat. 3553 (2008).   The amendments took effect on January 1, 2009.   Pub. L. No. 110-325, § 8, 122 Stat. 3553, 3559 (2008).   This legislation displaced the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing* and *Sutton*.   *See Ragusa*, 582 F. Supp. 2d

---

[9]Because Venter cannot establish a prima facie case of age discrimination, the burden does not shift to the defendants to articulate a legitimate, nondiscriminatory reason for terminating him.   *Alvarez v. Royal Atl. Developers, Inc.*, 574 F. Supp. 2d 1301, 1310 (S.D. Fla. 2008).   It is worthy of note that even if Venter were able to establish a prima facie case of age discrimination, he would not be able to discredit the USPS' articulated reason for the termination decision at issue.   The pretext inquiry will be discussed in the portion of this opinion concerning retaliation, since the defendants concede (for summary judgment purposes) that Venter can establish prima facie cases of retaliation under the ADEA and the Rehabilitation Act.   (Defs.' Br. in Supp. of Summ. J. (Docket No. 27) at 22 n.13.)

at 341-42 nn. 4-5.   Because the ADA Amendments Act contains no language indicating that it

applies retroactively, courts have construed its provisions to be purely prospective.   *Becerril*,

587 F.3d at 1164; *Milholland*, 569 F.3d at 565.   Since Venter was discharged prior to January 1,

2009, his Rehabilitation Act claim is governed by the more restrictive standard of disability

applicable under *Toyota Motor Manufacturing* and *Sutton*.

      At the time of Venter's discharge, the ADA defined the term "disability" as follows:

> (2) DISABILITY.--The term "disability" means, with respect to an
> individual--
> (A) a physical or mental impairment that substantially limits one or
> more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

Pub. L. No. 101-336, § 3; 104 Stat. 327, 329-30 (1990) (previously codified at 42 U.S.C. §

12102(2)).[10]   Defendants argue that Venter cannot establish the existence of a statutory

"disability" under the ADA and the Rehabilitation Act.   (Defs.' Br. in Supp. of Summ. J. at

16-19.)   Venter offers no response to that argument, leaving the court to guess how he intends to

establish his entitlement to statutory protection under the Rehabilitation Act.   (*See* Pl.'s Br. in

Opp'n to Defs.' Mot. for Summ. J.)

      During Venter's deposition, the following colloquy occurred:

> Q.     Okay.   What do you consider to be your disability?
>
> A.     I can't do my job.
>
> Q.     What exactly are you referring to when you say you can't
> do your job?

---

[10]The ADA's definition of the term "disability" is presently codified at 42 U.S.C. § 12102(1).   Although the wording of that definition remains substantially the same as it had been prior to 2009, it is followed by specific rules of construction designed to broaden the category of individuals entitled to statutory protection.   *See* 42 U.S.C. § 12102(1)-(4).   These rules of construction need not be discussed, since they are inapplicable to this case.

> A.   I can't load and unload the trailers or the trucks.
>
> Q.   What else?
>
> A.   That's it.
>
> Q.   And that's what you consider to be your disability?
>
> A.   That I can't do my job, correct.
>
> Q.   What is your physical disability?   I don't mean what duties you can't perform, but what is it about you that makes you disabled?
>
> A.   My lower back.

(Defs.' App. of Exs. in Supp. of Summ. J., Ex. A at 116.)   In order to be "substantially" limited in the "major life activity" of "working," an individual must be "unable to work in a broad class of jobs." *Sutton*, 527 U.S. at 491.   A mere inability to perform the duties of a *particular* job "will not suffice to establish a substantial limitation with respect to working." *Marinelli v. City of Erie*, 216 F.3d 354, 364 (3d Cir. 2000).   Venter cannot establish the existence of a statutory disability simply by showing that his impairments rendered him unable to perform the duties of *his* job.

In order to show that he was "regarded as" disabled, Venter must demonstrate that the USPS erroneously believed that he had an impairment that substantially limited one or more of his major life activities. *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 514 (3d Cir. 2001). Such a perceived impairment can, in reality, be either nonexistent or not substantially limiting. *Sutton*, 527 U.S. at 489 ("In both cases, it is necessary that a covered entity entertain misperceptions about the individual–it must believe either that one has a substantially limiting

impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."). Venter makes no attempt to explain his basis for believing that he was "regarded as" disabled. (*See* Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J.) In any event, he cannot show that the USPS "regarded" him as disabled simply by demonstrating that it accepted his request for light-duty work. *Kim v. Potter*, 460 F. Supp. 2d 1194, 1203 (D. Haw. 2006). Because Venter cannot establish (and makes no attempt to establish) that he was within the category of individuals entitled to statutory protection under the Rehabilitation Act at the time of his discharge, defendants' motion for summary judgment will be granted with respect to Venter's disability discrimination claim.[11]

### E.      The Retaliation Claims

The only remaining claims are Venter's retaliation claims under the ADEA and the Rehabilitation Act. (Compl. ¶¶ 43-44.) As noted earlier, the ADEA's federal-sector provision has been construed to prohibit a federal employer from retaliating against an employee who files an EEO complaint alleging age discrimination. *Gomez-Perez*, 128 S. Ct. at 1935-43. The standards applicable under the ADA's antiretaliation provision have been incorporated within the Rehabilitation Act. *See* 29 U.S.C. § 794(d); 42 U.S.C. § 12203.

### (1)   Prima facie case

In order to establish a prima facie case of retaliation, Venter must show that: (1) he

---

[11]Since Venter cannot establish the existence of a statutory disability, the court has no occasion to consider whether he would otherwise be able to establish a prima facie case of disability discrimination under the Rehabilitation Act. Even if it were assumed that Venter could establish a prima facie case of disability discrimination, he would be unable to discredit the USPS' legitimate, nondiscriminatory reason for terminating his employment. *See Reeves*, 530 U.S. at 146-49.

engaged in statutorily-protected activity;[12] (2) the USPS took a materially adverse[13] action

against him; and (3) there was a causal relationship between his protected activity and the USPS'

materially adverse action.   *LeBoon v. Lancaster Jewish Cmty. Ctr. Assoc.*, 503 F.3d 217, 231 (3d

Cir. 2007).   Venter engaged in protected activity when he filed EEO complaints in February

2004, August 2004, April 2005 and February 2007.   (Joint Statement of Material Facts ¶¶

35-38.)   Venter's discharge obviously constituted a materially adverse action.   *Exantus*

*Examplaire, v. Harbor Bar & Brasserie Rest.*, Civil Action No. 09-cv-2693, 2010 WL 715817, at

*6 (D.N.J. Feb. 25, 2010); *see Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 746 (7th Cir.

2002).   For purposes of the pending motion for summary judgment, defendants concede that

Venter can establish a prima facie case of retaliation.   (Defs.' Br. in Supp. of Summ. J. at 22

n.13.)

### (2) Defendants' legitimate, nondiscrimination reason

The burden of production has shifted to defendants to "clearly set forth, through the

introduction of admissible evidence, the reasons" for Venter's discharge.   *Burdine*, 450 U.S. at

255.   The USPS' reason for terminating Venter's employment is "clearly set forth" in the

documentary record.   On April 3, 2007, Dziubinski completed a "Request for Disciplinary

Action" form recommending that Venter's employment with the USPS be terminated.   (Defs.'

App. of Exs. in Supp. of Summ. J., Ex. S.)   Dziubinski's stated reason for recommending

---

[12]The filing of an EEO complaint alleging a form of discrimination prohibited under federal law constitutes
statutorily-protected activity as long as the complainant acts under an objectively reasonable belief that the conduct
about which he or she complains actually violated the applicable antidiscrimination statute.   *Clark County Sch. Dist.
v. Breeden*, 532 U.S. 268, 269-71 (2001); *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d
Cir. 2008).

[13]A "materially adverse" action is an action that may dissuade an objectively reasonable employee from making or
supporting a charge of discrimination.   *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 68
(2006).

termination was Venter's statements to Sample on March 7, 2007, concerning his desire to "kill" or "punch" Hoburg.   (*Id.*)   Baranowski signed the form in order to record his agreement with Dziubinski's recommendation.   (*Id.*)   Three days later, Dziubinski issued a "Notice of Proposed Removal" to Venter.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. T.)   The notice indicated that Venter's termination was being sought because of his comments in relation to Hoburg.   (*Id.*)   In a "Letter of Decision" dated May 8, 2007, Kustarz informed Venter that he was being discharged because of his "hostile behavior" on March 7, 2007.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. U.)

The testimonial record reflects that Venter was discharged because of his statements about Hoburg rather than because of his statutorily-protected activity.   During the MSPB hearing conducted on September 11, 2007, Kustarz testified that he terminated Venter because of Venter's "threats" to harm Hoburg.   (Defs.' App. of Ex. in Support of Summ. J., Ex. DD; MSPB Hearing Tr. at 142-144.)   Kustarz explained that he took Venter's "threats" seriously because the United States Post Office in Royal Oak, Michigan, where he previously worked, was the scene of a fatal shooting incident perpetrated by a disgruntled former postal employee.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. DD at 143.)   Pawlowski testified at the hearing that the USPS' policy prohibited employees from even "joking around" about wanting physically to harm someone.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. M at 59.)

The documentary and testimonial evidence contained in the record is more than sufficient to sustain defendants' burden of production and defeat the presumption of retaliation arising from Venter's prima facie case.   *Burdine*, 450 U.S. at 254-56.

### (3)   Pretext

In order to defeat defendants' motion for summary judgment, Venter must point to evidence which would enable a reasonable trier of fact to not only *disbelieve* the defendants' articulated reason for his termination, but also *believe* that retaliation for his statutorily-protected activities was the *real reason* for his discharge.   *Reeves*, 530 U.S. at 146-47.   He can accomplish this under the *Fuentes* two-prong test by either 1) casting sufficient doubt on the USPS' proffered reason for his termination to warrant a finding of retaliation, or 2) by providing affirmative evidence that retaliation was a "motivating or determinative cause" of the challenged personnel action.   *Fuentes*, 32 F.3d at 762.   Affirmative evidence of retaliatory discrimination can include evidence that (i) the USPS discriminated against Venter before terminating him, (ii) the USPS has unlawfully discriminated against other employees, or (iii) similarly situated employees who had not engaged in statutorily-protected activity were treated more favorably than Venter.  *See Prise v. Alderwoods Group, Inc.*, 657 F. Supp. 2d 564, 598 (W.D. Pa. 2009).

Sample testified that Venter verbally articulated a wish to "punch" and "kill" Hoburg. (Defs.' App. of Exs. in Supp. of Summ. J., Ex. I at 21.)   Hosack testified that Venter uttered similar statements in his presence.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. K at 61-64.) Venter admitted during his deposition that he had expressed a desire to "kill" Hoburg not only to the nurses who had been treating him, but also to Hosack.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. A at 86, 91.)   No reasonable trier of fact could conclude that Venter did not make the statements that were relied upon by the USPS as the basis for his termination.

### (a) Prong one

Venter can attempt to show that his statements were not the real reason for his discharge, but were instead merely a pretext for retaliation.   *See Weston v. Pennsylvania*, 251 F.3d 420, 432

23

(3d Cir. 2001). The crux of his argument is that his comments about wanting to "kill" Hoburg did not constitute true "threats," and that they would not have been construed as such by an objectively reasonable person.[14] (Pl.'s Br. in Opp'n to Defs.' Mot. for Summary J. at 1-2.) In support of his position, he relies on the decision of the United States Court of Appeals for the Federal Circuit in *Metz v. Department of the Treasury*, 780 F.2d 1001 (Fed. Cir. 1986). In *Metz*, the Court of Appeals for the Federal Circuit directed the MSPB to consider the following five factors in determining whether a statement uttered by an employee constitutes a "threat" warranting disciplinary action: (1) the listener's reactions; (2) the listener's apprehension of harm; (3) the speaker's intent; (4) any conditional nature of the statement; and (5) the attendant circumstances. *Metz*, 780 F.2d at 1002. Venter contends that, when these factors are considered, no reasonable person would have viewed his statements as "threats" to injure Hoburg. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. at 1-2.)

At the outset, it must be remembered that the specific factual issue in this case is whether the USPS retaliated against Venter for engaging in statutorily-protected activities. The court is not presented with the more general question whether the challenged personnel decision was otherwise appropriate. Venter's discharge constituted a "removal" under federal law. 5 U.S.C. § 7512(1). The USPS may take such an action against an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). If the MSPB affirms a decision by an agency imposing disciplinary action upon an employee, the aggrieved employee may seek review of the MSPB's decision by filing a petition for review with the United States Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(b)(1). The standard formulated by the Court

---

[14] As noted earlier, Venter does not specifically argue in his brief that his statements were used as a pretext for age or disability discrimination. He argues only that such statements were used as a pretext for retaliation. (Pl.'s Br. in

of Appeals for the Federal Circuit in *Metz* provided for the determination whether an agency's

decision to remove an employee for uttering a "threatening" statement would "promote the

efficiency of the service," not for the determination whether a "threatening" statement was used

only as a pretext for unlawful discrimination or retaliation.   *See Metz*, 780 F.2d at 1002-03.

Venter asserts discrimination and retaliation claims under the ADEA, the ADA and the

Rehabilitation Act, but he does not challenge the legality or propriety of his discharge in a more

general sense.   (Compl. ¶¶ 39-44.)   In this case, the factual question is whether the USPS acted

pursuant to a discriminatory or retaliatory animus, not whether the personnel action at issue was

"wise, shrewd, prudent, or competent."   *Fuentes*, 32 F.3d at 765.   Venter cannot prevail simply

by showing that the USPS was somehow "wrong or mistaken" about the nature of his statements.

*Id.*   Consequently, the standard enunciated in *Metz* does not directly govern this case.

Nevertheless, since a decision that is "foolish, imprudent, or incompetent" by comparison to an

employer's usual mode of operation can render that decision "implausible, inconsistent,

contradictory, or weak," the factors identified in *Metz* merit some consideration with respect to

the pretext inquiry in this case.   *Id.* at 765 n.8.

       In determining whether a statement constitutes a "threat" warranting either dismissal or

some other form of discipline, the Court of Appeals for the Federal Circuit considers both the

listener's "reactions" to that statement and his or her "apprehension of harm."   *Metz*, 780 F.2d at

1002.   In this case, these two factors do not weigh in favor of Venter.   During her deposition,

Sample explained how Venter acted at the Occupational Health Office on March 7, 2007.

(Defs.' App. of Exs. in Supp. of Summ. J., Ex. I at 19, 21.)   By his own admission, Venter went

there because he wanted a medical excuse to leave work early; Venter stated, "I realized I was

just too stressed out, too upset to do any of my work anymore."   (Defs.' App. of Exs. in Supp. of

Summ. J., Ex. A at 85.)   Venter apparently entered an examination room with Streitman, who

performed a limited physical examination to assess his medical condition.   (Defs.' App. of Exs.

in Supp. of Summ. J., Ex. I at 19.)   Streitman determined that Venter was "fit for duty" because

her examination did not detect any palpable problems.   (Defs.' App. of Exs. in Supp. of Summ.

J., Ex. A at 87-88.)   Believing that he was "too stressed out" to work, Venter left the

examination room and spoke with Sample, who concluded that Venter should leave the facility.

(*Id.* at 86-91.)   Sample gave the following testimony concerning her encounter with Venter:

> Q.   So Venter came to you.  Can you be specific in terms of
>        some of the things he said that he wanted to do?
>
> A.   I mean, he came in, and he was shaking.   His face was red.
>        He was almost in tears.   He said, "I want to punch him out
>        if I get near him.   I want to kill him."   He was very, very
>        distraught.   I was concerned for Mr. Venter.   I was
>        concerned for him at that point in time.
>
> Q.   I guess he told you that he came to your office so he could
>        get a medical release to go home?
>
> A.   That's correct, and I agreed that he needed to go home.

(Defs.' App. of Exs. in Supp. of Summ. J., Ex. I at 21.)   Sample testified that she was "afraid"

that a confrontation between Venter and Hoburg would ensue if the two of them were to interact.

(*Id.* at 34.)

        When Venter reported to Hosack's office, Venter again stated that he wanted to "kill"

Hoburg.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. K at 58.)   According to Hosack, Venter

was "visibly shaken" and "agitated" on that occasion.   (*Id.* at 62.)   Hosack responded by

sending an email message to Baranowski about the situation.   (Defs.' App. of Exs. in Supp. of

Summ. J., Ex. H.)   In that message, which was sent on the morning of Thursday, March 8, 2007,

Hosack indicated that Venter expressed doubt about whether he would be prepared to return to

work on the following Saturday.   (*Id.*)   Hosack mentioned that Sample had recommended a

"threat assessment" concerning the matter.   (*Id.*)

      In light of the undisputed evidence of record, the first two *Metz* factors weigh against

Venter.   Sample's encounter with Venter left her "apprehensive" about the situation, and she

"reacted" by insisting that he be permitted to leave work early even though Streitman's physical

examination findings did not provide a clear basis for a medical excuse.   Although Hosack may

not have been as alarmed as Sample, he informed Baranowski about Sample's suggestion that a

"threat assessment" be conducted.   These facts distinguish this case from *Metz*, in which the

Court of Appeals for the Federal Circuit observed:

> Two employees, Olsen and Barton, allegedly heard Metz make
> remarks that threatened his superiors.   How did Olsen and Barton
> react to these "threats"?   Olsen went camping in North Carolina
> for a week and Barton went to work.   It is literally true that Olsen
> and Barton were "concerned"; both Olsen and Barton stated
> concern in their testimony before the presiding official.   However,
> both Olsen and Barton also testified that they did not expect Metz
> to carry out the "threats."   How did the agency find out about the
> conversation between Metz and Olsen and Barton?   Barton
> happened to mention his talk with Metz in a casual conversation to
> a friend who was a supervisor.   Later in the day, an agency official
> asked Barton to make a statement.   Barton did find Metz' [sic]
> remarks interesting enough to mention them in casual
> conversation, but Barton did nothing more.   Olsen volunteered his
> conversation with Metz only after he returned from his vacation
> and learned that the agency intended to discipline Metz.   The
> record does not provide a shred of evidence showing that Barton or
> Olsen reacted to Metz' [sic] statements as if they were threats.

*Metz*, 780 F.2d at 1003.   The instant case is unlike the situation in *Metz*, in which the listeners

did not "react" to the relevant statements as "threats."   Sample and Hosack immediately

informed the appropriate USPS officials of Venter's comments about Hoburg, prompting both a

visit to Venter's home by postal police officers and the placement of Venter on "off-duty status."

(Joint Statement of Material Facts ¶ 25; Defs.' App. of Exs. in Supp. of Summ. J., Ex. L.)

Given the reaction of Sample and Hosack to Venter's statements, it is difficult to fathom how

Venter believes that *Metz* helps his claims more than it undermines them.

The remaining three *Metz* factors are the speaker's "intent," the "conditional nature" of

his or her statements, and the "attendant circumstances."   *Metz*, 780 F.2d at 1002.   The record

of Venter's predisciplinary interview indicates that, according to Venter, he told Hosack on

March 7, 2007, that he did not really intend to "kill" Hoburg, and that he was just angry about

Hoburg's unwillingness to initiate the grievance process.   (Defs.' App. of Exs. in Supp. of

Summ. J., Ex. R.)   This evidence, which must be viewed in the light most favorable to Venter,

indicates that Venter never *subjectively* intended to inflict physical harm upon Hoburg.   That

factor alone cannot be dispositive, however, since it is only a single part of a broader inquiry into

whether an *objectively* reasonable person would perceive a statement uttered by an individual to

be a true "threat."   *Metz*, 780 F.2d at 1002-03; *see also Meehan v. USPS*, 718 F.2d 1069, 1075

(Fed. Cir. 1983) ("Giving the connotation which a reasonable person would give to the words,

we find no error in the board's rejection of that interpretation.").   The other two factors do not

weigh in Venter's favor.   He stated unequivocally that he wanted to "kill" Hoburg. [15]   (Defs.'

---

[15] The court acknowledges that Venter may not have stated that he would, in fact, "kill" Hoburg.   When asked
during his deposition whether he had stated that he *would* "kill" Hoburg, Venter testified that he had said something
like this: "I'm so mad I could [kill Hoburg]."   (Pl.'s App. in Opp'n to Defs.' Mot. for Summ. J. (Docket No. 32),
Ex. A.1 at 163.)   The statement described by Venter is not a *conditional* statement, such as this: "I am going to kill
him if he does not file the grievance."   Such a statement could be readily construed as an expression of the speaker's
desire for action rather than as an expression of his or her desire to inflict physical harm upon the referenced
individual.   The record does not contain evidence indicating that Venter's statements in relation to Hoburg were

28

App. of Exs. in Supp. of Summ. J., Ex. A at 86, 91, 94.)   There was nothing "conditional" about his statements to Sample and Hosack.   The "attendant circumstances" also provided a reasonable basis for the USPS to conclude that Venter actually "threatened" to harm Hoburg.   Venter testified that he sought to obtain a medical excuse from Streitman and Sample because he was "too stressed out" and "too upset" to continue working.   (*Id.* at 85.)   Given that Venter's verbal confrontation with Hoburg rendered him unable to do his job, it was not objectively unreasonable for the USPS to conclude that Venter actually "threatened" to harm Hoburg in a fit of rage.

Based on the evidence contained in the record, four of the five factors discussed by the Court of Appeals for the Federal Circuit in *Metz* clearly weigh against Venter and in favor of defendants.   While the *Metz* factors do not control the analysis in this case, since the court is not called upon to determine whether the termination of Venter's employment with the USPS "promote[d] the efficiency of the service, " 5 U.S.C. § 7513(a), these factors, illustrate why Venter cannot show that defendants' explanation for discharging him is sufficiently "implausible, inconsistent, contradictory, or weak" to enable a reasonable trier of fact to conclude that a discriminatory or retaliatory animus was the motivation for his removal.[16]   *Fuentes*, 32 F.3d at 765 n.8.   The "core facts" in this case are not in dispute.   *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) ("We have applied the principles explained in *Fuentes* to require

---

"conditional."

[16] Venter cites to decisions rendered in criminal cases involving individuals alleged to have threatened to kill President Lyndon B. Johnson and Palestine Liberation Organization Chairman Yasser Arafat:   *Watts v. United States*, 394 U.S. 705 (1969); *United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976); *Roy v. United States*, 416 F.2d 874 (9th Cir. 1969).   In this case, the burden is on Venter to prove, by a preponderance of the evidence, that the USPS terminated him because of a discriminatory or retaliatory animus.   *See Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007).   In a criminal case, the government bears the burden of proving the defendant's guilt beyond a reasonable doubt.   *Robertson v. Klem*, 580 F.3d 159, 164-65 (3d Cir. 2009).   Since the decisions cited by Venter are unrelated to the pretext inquiry in this case, the court will not discuss them.

plaintiffs to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision.").   Venter did not introduce evidence to discredit the defendants' articulated reason for discharging him and failed to satisfy prong one of the *Fuentes* test.

### (b) Prong two

Venter has presented no affirmative evidence indicating that the defendants were motivated by a discriminatory or retaliatory animus and did not satisfy the second prong of the *Fuentes* test.[17]   *See Fasold v. Justice*, 409 F.3d 178, 185 (3d Cir. 2005).   Based upon the evidence, the court concludes no reasonable jury could render a verdict in favor of plaintiff with respect to his retaliation claims and summary judgment will be granted in favor of defendants.[18] *See Reeves*, 530 U.S. at 148-49.

### F.        The Motion to Strike

Defendants filed a motion to strike an affidavit signed by Venter on September 3, 2009. (Defs.' Mot. to Strike Pl.'s Aff. in Opp'n to Summ. J. (Docket No. 36).)   In that affidavit, Venter stated that Baranowski, Kustarz and Dziubinski "intended to retaliate and discriminate" against him on the basis of impermissible factors.   (Pl.'s App. in Opp'n to Defs.' Mot. for Summ. J., Ex. 7 ¶ 41.A.)   Conclusory assertions of discriminatory intent contained in an affidavit submitted by

---

[17]  The record contains evidence revealing how two other postal employees were treated under similar circumstances. Defs.' App. of Ex. in Support of Summary J., Exs. EE, FF, GG and HH.   Venter refers to the "issue of comparators" as a "red-herring" that he is not advancing as a basis for opposing the defendants' motion for summary judgment. Pl.'s Sur-reply Br. in Opposition to Defs.' Mot. for Summary J. (Docket No. 48) at 1.

[18]  In light of the granting of summary judgment, there is no need to address defendants' remaining arguments concerning Venter's lack of entitlement to compensatory damages, punitive damages, and a jury trial.   (Defs.' Br. in Supp. of  Summ. J. at 23-30.)

a plaintiff cannot defeat a properly supported motion for summary judgment filed by the defendant. *Barefield v. Bd. of Trs.*, 500 F. Supp. 2d 1244, 1264 (E.D. Cal. 2007) ("'Mere conclusory assertions of discriminatory intent, embodied in affidavits or deposition testimony, cannot be sufficient to avert summary judgment. The court must satisfy itself that there is sufficient [evidence of intent] to create a genuine issue of fact for the jury, before it can deny summary judgment . . . .'" (quoting *Lindsey v. Shalmy*, 29 F.3d 1382, 1385 (9th Cir. 1994))). The remaining allegations contained in the affidavit, even if credited, would not alter the court's analysis of the substantive issues in this case. Since defendants are entitled to summary judgment even considering Venter's affidavit, the motion to strike will be denied on the ground that it is moot. *United States v. Gatto*, 924 F.2d 491, 501 (3d Cir. 1991).

## V.   *Conclusion*

Venter does not deny that he told Sample and Hosack that he wanted to "kill" Hoburg. Indeed, he affirmatively testified that he had told both Sample and Hosack that he wanted to "kill" Hoburg. (Defs.' App. of Exs. in Supp. of Summ. J., Ex. A at 86, 91.) At the time of Venter's statements, the USPS had a policy which unambiguously prohibited a postal employee from making "any actual, implied or veiled threat, made seriously or in jest." (Defs.' App. of Exs. in Supp. of Summ. J., Ex. J.) When he made his comments to Sample and Hosack, Venter indicated that he was medically incapable of completing the remainder of his shift even though Streitman's physical examination revealed no objective basis for a medical excuse. (Defs.' App. of Ex. in Supp. of Summ. J., Ex. A at 87-88.) In light of Venter's own statements indicating that his encounter with Hoburg had left him "too stressed out" to work, it was not objectively unreasonable for USPS officials to take a serious approach to the situation. (*Id.* at 88.)

Venter's comments concerning Hoburg were expressly relied upon by Kustarz as the reason for

Venter's removal.   (Defs.' App. of Exs. in Supp. of Summ. J., Ex. U.)   Venter produced no

evidence impugning the "core facts" relied upon by defendants in support of their decision to

discharge him.   *See Tomasso v. Boeing Co.*, 445 F.3d 702, 708 (3d Cir. 2006).   Accordingly,

defendants' motion for summary judgment will be granted.   The defendants' motion to strike

will be denied on the ground of mootness.

By the court,

/                                                            /s/ JOY FLOWERS CONTI
                                                              Joy Flowers Conti
                                                              United States District Judge

Dated:   March 9, 2010